IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CATHERINE ROLLINS, | ) | CASE NO. 4:15-cv-01018 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Catherine Rollins ("Plaintiff" or "Rollins") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Supplemental Security Income.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.   As explained more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Rollins protectively filed an application for Supplemental Security Income on March 29, 2011.[1]  Tr. 32, 115, 135, 211-216, 231.  Rollins alleged a disability onset date of March 29, 2011.  Tr. 32, 211, 231.   She alleged disability due to sleep apnea, bilateral carpal tunnel, arthritis, and back, shoulders, neck and feet issues.  Tr. 138, 147, 235.   Rollins's application was denied initially and upon reconsideration by the state agency.  Tr. 138-144, 147-153.  Rollins

---

[1]  The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 5/16/2016).

requested an administrative hearing.  Tr. 154-156.   On August 6, 2013, Administrative Law Judge Paula J. Goodrich ("ALJ") conducted an administrative hearing.  Tr. 77-91.  During the August 6, 2013, hearing, the ALJ raised the possibility that Rollins might have the ability to proceed with a Title II Disability Insurance Benefits ("DIB") application in addition to her SSI application.  Tr.  87-91. In order to allow Rollins and her counsel the opportunity to investigate the matter further, the hearing was continued.  Tr.  91.  After Rollins's counsel determined that Rollins did not qualify for DIB, the ALJ conducted a second administrative hearing on October 30, 2013, with respect to the SSI application.  Tr. 48-76.

In her January 24, 2014, decision (Tr. 29-47), the ALJ acknowledged a prior unfavorable ALJ decision, dated September 9, 2009, but concluded that there was new and material evidence and therefore she did not adopt the prior decision (Tr. 32).  Notwithstanding the new evidence, the ALJ determined that Rollins had not been under a disability since March 29, 2011, the date the application was filed.  Tr. 32-42.  Rollins requested review of the ALJ's decision by the Appeals Council.  Tr. 28.  On March 31, 2015, the Appeals Council denied Rollins's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.      Personal, educational and vocational evidence

Rollins was born in 1965.  Tr.  41, 82, 211, 231.  She completed the 10th grade.  Tr. 53, 84, 236.  During an August 10, 2012, consultative evaluation, Rollins reported that she was single, had never married and had six adult children.  Tr. 468.  At the time of the hearings in 2013, Rollins was living in a house with one of her sons who she described as handicapped and

her 13 year old granddaughter.[2]  Tr. 53, 82-83, 468.  Rollins's past work includes work as an MMRD residential aide, housekeeper in a nursing home, and as a babysitter.  Tr. 53-55, 84-87, 282.  Her most recent work was babysitting in 2011 through 2012.  Tr.  34, 55, 86-87.

**B.  Medical evidence**

    **1.  Physical impairments**

        **a.  Treatment history**

Rollins has a history of knee pain dating back to at least 2005 with treatment by Dr. Michael P. Stanich, D.O.  Tr. 290-294.   On November 28, 2007, Rollins saw Dr. Stanich with complaints of right knee discomfort, hurting, aching, swelling, collapsing, and locking.  Tr. 293. Dr. Stanich assessed osteoarthritis with some evidence of a torn medial meniscus of the right knee with hydrarthrosis and ordered an MRI, noting that depending on the results of the MRI, arthroscopic surgery may be warranted.  Tr. 293.  A December 5, 2007, MRI showed large joint effusion, moderately severe chondromalacia patella; and a degenerative type horizontal cleavage tear in the mid and posterior portions of the medial meniscus.  Tr. 292, 293.  On January 8, 2008, Dr. Stanich performed a right knee arthroscopy, partial medial meniscectomy of the right knee, chondroplasty of the medial femoral condyle of the right knee, and joint irrigation.  Tr. 290.  Dr. Stanich's postoperative diagnoses were torn medial meniscus right knee and chondral defect of the medial femoral condyle right knee.  Tr. 290.

Nerve conduction/EMG studies conducted in May 2009 revealed findings consistent with carpal tunnel syndrome.  Tr. 347-348.  In early 2010, Rollins was in her garage and got her finger caught in the door.  Tr. 305.  She pulled with her right arm and started feeling pain in her right wrist.  Tr. 304-305.  Rollins saw Dr. Douglas H. Musser, D.O., and was diagnosed with

---

[2] Rollins has custody of her 13 year old granddaughter.  Tr. 53, 82-83.  Although she has custody of her granddaughter, her granddaughter's mother, i.e., Rollins's daughter, remains involved.  Tr. 66.  For example, Rollins's daughter rather than Rollins attends parent/teacher conferences at school.  Tr. 66.

scapholunate disassociation.  Tr. 304-305.  Dr. Musser recommended that Rollins keep her wrist splinted and start with gentle wrist exercises.  Tr. 304.  On April 21, 2010, Rollins saw Michael A. Shumaker, PA-C, for follow up.  Tr. 303.  Rollins reported doing fairly well but she had some weakness with her grip strength and some limited range of motion.  Tr. 303. She was doing physical therapy.  Tr. 303.  Mr. Shumaker consulted with Dr. Musser and recommended that Rollins continue with therapy and follow up in six weeks.  Tr. 303.

On August 18, 2010, Rollins was seen by Dr. Cybele A. Wassef, M.D., for outpatient follow up.  Tr. 295.  Rollins continued to report bilateral knee pain with pain more on the right and with recurrent swelling.  Tr. 295.  Rollins reported bilateral hand pain and numbness, more marked on the right.  Tr. 295.  Dr. Wassef noted that Rollins had a documented moderate bilateral median neuropathy of the wrist.  Tr. 295.  Rollins had a wrist splint but had not been using it on a regular basis.  Tr. 295.  Rollins was taking ibuprofen and using ice.  Tr. 295.  Dr. Wassef noted Rollins's diagnosis of scapholunate disassociation which was related to her falling in the garage.  Tr. 295.  Dr. Wassef also noted that Rollins had been in a motor vehicle accident on August 1, 2010, resulting in neck pain and stiffness.  Tr. 295.  Also, Dr. Wassef indicated that Rollins was feeling depressed and was continuing to report low back pain that worsened with standing and walking and occasionally radiated into her right lower extremity.  Tr. 295.

Dr. Wassef's physical examination revealed increased lumbar lordosis and poor abdominal muscle tone and bilateral pes planus.  Tr. 295.  Rollins exhibited tenderness on palpation of the lower lumbar spine at the L4-5 and L5-S1 levels, as well as the right lower lumbar facet joints.  Tr. 295.  She also had tenderness on palpation of the medial joint line of the knees, greater on the right, and crepitus on range of motion and a positive patellar tap on the right.  Tr. 296.  Rollins denied tenderness on palpation of the sciatic notch bilaterally.  Tr. 295.

Rollins's muscle strength in both her upper and lower extremities was within normal limits.  Tr. 296.  Dr. Wassef's impression was mechanical low back pain with postural deficits; chondromalacia patella and osteoarthritis of the knees with chondral defect of the right knee; degenerative disc disease of the cervical spine with facet joints arthropathy and neuroforaminal encroachment; bilateral mild to moderate entrapment of the median nerve at the wrist; status post right scapholunate disassociation secondary to a fall in February 2010; morbid obesity; anxiety and depression; and uterine fibroids and borderline elevation of blood pressure.  Tr. 296.

Dr. Wassef's recommendations included drastic weight loss, physical therapy and aquatics program, orthopedic consultation at St. Elizabeth Health Center, wearing wrist splint at night, a surgical consult regarding decompression, and smoking cessation.  Tr. 296.

An April 12, 2011, x-ray of the right knee showed mild degenerative changes of the right knee.  Tr. 391.

During a visit to Dr. William G. Paloski, M.D., on May 23, 2011, Rollins complained of pain in her knees and requested a refill of her pain medication.  Tr. 377.  In June 2011, Rollins saw Dr. Paloski with complaints of pain in her arms and hands.  Tr. 379.

Rollins attended an initial physical therapy evaluation on October 18, 2011, for her knees.  Tr. 544-545.  While ambulating, Rollins exhibited antalgic gait deviations.  Tr. 544.  Rollins had tenderness at the joint line in both her right and left knee and she had joint crepitus at the right and left patellofemoral joint.  Tr. 544.  She had decreased strength.  Tr. 544.  In January 2012, Rollins was discharged from physical therapy because she did not return to physical therapy after the initial October 18, 2011, evaluation.  Tr. 544.

On December 30, 2011, Rollins saw Dr. Stanich with her chief complaint being right knee discomfort, hurting, aching and some swelling.  Tr. 288.  Dr. Stanich noted Rollins's past

arthroscopic surgery.  Tr. 288.  He also noted that Rollins had undergone Synvisc injections that helped for a period of time.  Tr. 288.  On physical examination, Dr. Stanich observed periarticular thickness and minimal effusion.  Tr. 288.  There was tenderness over the medial compartment and tenderness over the medial joint line.  Tr. 288.  There was no gross instability. Tr. 288.  Rollins was able to perform straight leg raises against gravity and there were no quadriceps or patellar tendon defects.  Tr. 288.  Dr. Stanich's impression was minimal osteoarthritis with degenerative menisci and synovitis of the right knee.  Tr. 288.  Dr. Stanich gave Rollins a cortisone injection and recommended that she start warm soaks and range of motion exercises and follow up with him in one month.  Tr. 288.  A December 30, 2011, x-ray showed moderate narrowing of the medial compartment of the knee consistent with meniscal pathology.  Tr. 289.

During a follow up appointment with Dr. Stanich on February 1, 2012, Rollins was continuing to have symptoms with her knee.  Tr. 288.  The injection had not helped.  Tr. 288.  A recommendation was made for another arthroscopic surgery.  Tr. 288.

On April 10, 2012, Rollins sought treatment at the emergency room for back pain that had started three days prior.  Tr. 430.  She reported that her pain had been constant and mild and there was nothing that was making the pain worse.  Tr. 430.  Rollins also reported being depressed with thoughts of suicide.  Tr.  430, 436.  Turning Point was consulted and, once Rollins stable, her mother was going to transport her to Turning Point.  Tr. 434-435.

During a June 6, 2012, medical visit at Healthridge Medical Center ("Healthridge") with Richard A. Bailey, Jr., a physician assistant ("PA"), Rollins complained that her left knee was buckling.  Tr. 456-457.  During the visit, Rollins walked with a normal gait and station and there was no gross instability with stressing.  Tr. 456.  However, there was mild crepitus with

extension of the knees bilaterally and mild edema bilaterally.  Tr. 456.  The physician assistant recommended ibuprofen and that Rollins see Dr. Stanich.  Tr. 457.

Rollins saw Dr. Stanich on June 20, 2012, regarding her left knee problems.  Tr. 489, 495.  On physical examination, Rollins had periarticular thickness and minimal effusion, moderate crepitus, and there was tenderness over the medial joint line.  Tr. 489, 495.  X-rays of Rollins's left knee and bilateral standing knees were taken that day.   Tr. 496.  The x-rays showed mild degenerative changes in both knees.  Tr. 496.  Dr. Stanich's impression was minimal to moderate osteoarthritis in the left knee with hydrarthrosis and degenerative menisci.  Tr. 489.  He gave Rollins a cortisone injection and tramadol for pain.  Tr. 489, 495.  If Rollins showed some improvement with the injection, Dr. Stanich indicated he would proceed with a second injection and, if she did not improve, he would follow up with an MRI.  Tr. 489, 495.  On July 20, 2012, Dr. Stanich saw Rollins and noted that she was doing better following the injection.  Tr. 495.  He provided Rollins with another prescription for tramadol and indicated that he would see her again if there were problems.  Tr. 495.

In July 2012, Rollins saw Dr. Stephen Crowe, M.D., reporting that her sleep apnea symptoms, including daytime fatigue, had returned.  Tr. 531.  Dr. Crowe ordered a sleep study, which was conducted in May 2013.[3]  Tr. 531, 522.

On March 5, 2013, Rollins was seen at Healthridge for complaints of a dry mouth and sore tongue when eating and for a medication refill and diabetes check-up.[4]  Tr. 483-485.  During the visit, Rollins indicated that, since her mother had died, she had stopped going to the

---

[3] The results of the sleep study were obstructive sleep apnea, worse in REM sleep; upper airway resistance syndrome, suspected; and prior insufficient sleep, suspected.  Tr. 522.  CPAP titration was planned.  Tr. 522.

[4] It is not clear which medical provider saw Rollins on March 5, 2013.  However, it appears that it may have been PA Bailey because a chest exam was ordered on March 5, 2013, by PA Bailey.  Tr. 487.  That exam showed no acute cardiopulmonary process.  Tr. 487.

pain clinic.  Tr. 483.  Rollins denied musculoskeletal issues.  Tr. 484.  The examiner indicated that Rollins walked with a normal gait and station.  Tr. 483.

In April 2013, Rollins saw Tina Smith, a PA at Healthridge.  Tr. 558-559.  Rollins needed SSI paperwork completed and complained that she had had a tingling sensation in her right arm and wrist for about two to three weeks.  Tr. 558.  PA Smith noted a history of carpal tunnel syndrome with symptoms only over 2-3 weeks.  Tr. 558.  Rollins had never taken medication or used splints for her carpal tunnel syndrome.  Tr. 558.  PA Smith noted that Rollins had missed a previously scheduled sleep study and was still smoking.  Tr. 558.  PA Smith noted that Rollins wanted Ultram and Dr. Stanich would not give her any.  Tr. 558.  PA Smith also noted that Rollins had been without narcotics since December 2011.  Tr. 558.  On physical examination, Rollins walked with a normal gait and station, she had normal upper and lower extremity and grip strength, no crepitus of knees, and a positive phalen and tinnels sign.  Tr. 559.  PA Smith recommended a splint for carpal tunnel syndrome.  Tr. 559.

On May 17, 2013, Rollins saw PA Smith with complaints of pain in both knees that was going down into her legs.  Tr. 509-510, 563-565.  Rollins indicated that she wanted to see a doctor other than Dr. Stanich and she wanted to see a pain doctor.  Tr. 509, 563.  Her pain was mostly in her knees but also in her back.  Tr. 509, 563.  During the visit, Rollins walked with a normal gait and station.  Tr. 510, 564.  Since Rollins did not want to see Dr. Stanich, there was a note made regarding an orthopedic referral.  Tr. 510, 564.  On May 24, 2013, Dr. Tyson Schrickel of the Orthopedic Trauma unit at St. Elizabeth Health Center advised that he would not assume orthopedic care of Rollins but indicated that the referral could be resubmitted after Rollins attended six weeks of physical therapy.  Tr. 566.

Rollins saw Dr. Shultz at Healthridge on June 3, 2013.  Tr. 511-512.  Rollins had been seen at the emergency room on May 22, 2013, for knee pain and was still in pain and her right knee was swollen.  Tr. 511.  An x-ray of Rollins's right knee taken on that day showed mild to moderate degenerative changes.  Tr. 520.  Rollins was advised to continue to take anti-inflammatories and she was placed on Ultram.  Tr. 511.  She was also advised to follow up with an orthopedic surgeon.  Tr. 511.

Following a motor vehicle accident, on June 18, 2013, Rollins had x-rays taken of her lumbar and cervical spine.  Tr. 583-584.  The lumbar spine x-ray showed mild osteoarthritic change.  Tr. 583.  The cervical spine x-ray showed osteoarthritic changes that were slightly more severe as compared to an April 2008 study.  Tr.  584.

Rollins saw PA Smith with Healthridge on August 8, 2013.  Tr. 580-581.  Rollins complained of knee pain.  Tr. 580.  PA Smith noted that Dr. Shultz had previously prescribed Ultram.  Tr. 580.  However, prior to that, PA Smith had not been prescribing narcotics.  Tr. 580.  PA Smith indicated that Rollins had cancelled an appointment with Dr. Stanich and was supposed to have gone to the pain clinic but she did not do so.  Tr. 580.  PA Smith was not willing to prescribe narcotics.  Tr. 580.  On examination, Rollins's gait and station were normal.  Tr. 580.

Follow up lumbar and cervical spine x-rays were taken on August 12, 2013, for comparison to the June 18, 2013, x-rays that were taken following a motor vehicle accident.  Tr. 578-579.  The lumbar spine x-ray showed mild discogenic changes in the spine.  Tr. 578.  The vertebral bodies were of normal height and alignment.  Tr. 578.  The cervical spine x-ray again showed multilevel discogenic degenerative changes.  Tr. 579.

On November 7, 2013, Dr. Michael A. Jones, D.O., ordered an MRI of Rollins's right knee because of knee pain.  Tr. 586.  The MRI showed complex horizontal posterior medial meniscus with small to moderate knee joint effusion; mild overall degenerative changes in the patellar femoral joint; and focal degenerative subchondral changes intercondylar distal femur. Tr. 586.  On November 14, 2013, Rollins saw Dr. Jones for follow up of her MRI.  Tr. 585. Rollins relayed that both knees were continuing to bother her a lot.  Tr. 585.  She had not gotten much relief from an injection.  Tr. 585.  Since her knees were bothering her so much she wanted to have arthroscopy.  Tr. 585.  Dr. Jones's impression was degenerative joint disease bilaterally in her knees and right knee posterior horn of the lateral meniscus tear.  Tr. 585.  Dr. Jones discussed various surgical and non-surgical treatment options and stressed that the most important thing for Rollins long term was weight loss.  Tr. 585.  However, since Rollins did have a meniscus tear with mechanical symptoms in her right knee, Rollins decided she wanted to proceed with arthroscopy.  Tr. 585.

### b.  Medical opinions

#### *Consultative Examining Physician Prabhudas Lakhani, M.D.*

On July 11, 2011, Prabhudas R. Lakhani, M.D., an internal medicine physician saw Rollins for a consultative evaluation.  Tr. 400-407.   Rollins's chief complaints were bilateral knee pain and right hip pain.  Tr. 404.  As far as her past history, Rollins indicated that she had been in a 2010 automobile accident, followed by neck pain; she had had left foot surgery; and she had had left knee arthroscopic surgery for cartilage in 2007.  Tr. 404.  Rollins also relayed that she had had knee pain for 5 years.  Tr. 405.  She reported being able to stand for about 45 minutes before needing to sit down and extend her knee.  Tr. 405.  She was able to walk half a block and then finish walking the rest of the block slowly.  Tr.  405.  She indicated that she had

right hip pain after sitting for an hour and then has to switch positions due to the pain traveling to her right thigh and right knee and then through to her leg.  Tr.  405.  Rollins reported having low back pain for several years, about 3 days per week, but without any radiation.  Tr. 405.  Because of neck pain, Rollins reported that her shoulders and upper extremities hurt.  Tr. 405.  Her sleep is disturbed and she wakes up in pain.  Tr. 405.  Rollins was diagnosed with carpal tunnel syndrome primarily on her right side.  Tr. 405.  Rollins's children, not Rollins, clean the house.  Tr. 405.  Rollins cannot do her own hair and she cannot type.  Tr. 405.  Rollins's neck hurts because of disc problems, especially when reading or flexing.  Tr. 405.

On physical examination, Dr. Lakhani observed that Rollins's gait and ambulation were normal without ambulatory aids.  Tr. 406.  As far as Dr. Lakhani's musculoskeletal examination findings, Dr. Lakhani indicated that crepitation was felt in the movement of both knees; there was no redness or swelling; no heat was present; Rollins had pain in her hip and knee with movement of the right hip and knee extension; Rollins was unbalanced while walking on toes due to knee pain but her ability to walk on heels was okay; knee flexion was limited secondary to pain; and other range of movements were unremarkable.  Tr. 406.  Dr. Lakhani's neurological examination findings were as follows: "Babinski is plantar flexor.  Deep tendon reflexes are normal.  No sensory loss.  No wasting of muscles present.  Cranial nerves are intact.  Rhomberg's sign is negative."  Tr. 406.  Dr. Lakhani reviewed x-rays, noting that hip and leg x-rays showed that sclerodic changes were present on the acetabulum, joint spaces were maintained but slightly narrow, the head was not deformed, other extremities were unremarkable, and no spur formation was noted.  Tr. 406.

Dr. Lakhani's diagnostic impression was: (1) generalized arthritis primarily in the cervical spine, knees and to some extent in the right hip; (2) carpal tunnel syndrome; and (3)

obesity. Tr. 407. For his medical source statement, Dr. Lakhani stated: "Based on objective findings, this woman is alert and oriented. Concentration, hearing and speech is normal. Pain is limiting her activities, she possibly could be a candidate for less then sedentary type of work." Tr. 407.

### State agency reviewing physicians

On July 22, 2011, state agency reviewing physician Elaine M. Lewis, M.D., completed a physical RFC assessment. Tr. 110-112. She gave great weight to Dr. Lakhani's opinion that Rollins possibly could be a candidate for less than sedentary type work. Tr. 110. For her own opinion, Dr. Lewis opined that exertionally Rollins could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand and/or walk (with normal breaks) for a total of 4 hours; sit (with normal breaks) for a total of 6 hours in an 8-hour workday; and ability to push and/or pull was unlimited except as indicated for ability to lift/carry. Tr. 111. With respect to postural limitations, Dr. Lewis also opined that Rollins could never climb ladders/ropes/scaffolds or kneel; occasionally climb ramps/stairs, crouch, and crawl; frequently stoop; and ability to balance was unlimited. Tr. 111. Dr. Lewis explained that her postural limitations were based on Rollins's bilateral crepitus in her knees and pain with motion in her right hip. Tr. 111. Dr. Lewis also opined that Rollins would need to avoid all exposure to hazards such as machinery and heights. Tr. 112.

Upon reconsideration, on July 12, 2012, state agency reviewing physician Rannie Amiri, M.D., completed a physical RFC assessment. Tr. 129-131. Dr. Amiri gave "other" weight to Dr. Lakhani's opinion on the basis that the totality of the evidence in the file did not support Dr. Lakhani's conclusion that Rollins could possibly be a candidate for less than sedentary type work. Tr. 128. Dr. Amiri opined that Rollins could occasionally lift/carry 20 pounds and

frequently lift/carry 10 pounds; stand and/or walk (with normal breaks) for a total of 6 hours in

an 8-hour workday; sit (with normal breaks) for a total of 6 hours in an 8-hour workday; and

ability to push and/or pull was unlimited except as indicated for ability to lift/carry.  Tr. 129.  Dr.

Amiri explained her opinion further by stating that Rollins was morbidly obese with mild-to-

moderate bilateral knee degenerative joint disease in addition to cervical degenerative disc

disease; Rollins had a normal gait and preserved lower extremity strength as reflected in the

consultative examiner's report; Rollins had no need for an ambulatory aid; Rollins had cervical

degenerative disc disease and bilateral carpal tunnel syndrome but her upper extremity

manipulative function appeared normal.  Tr. 129.  With respect to postural limitations, Dr. Amiri

opined that Rollins could never crawl or climb ladders/ropes/scaffolds; could occasionally climb

ramps/stairs, kneel and crouch; and could frequently balance and stoop.  Tr. 129.   Due to carpal

tunnel syndrome, Dr. Amiri opined that it was reasonable to limit Rollins's ability to do bilateral

fingering to frequent.  Tr. 130.  Dr. Amiri also opined that Rollins would need to avoid

concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. and would need to

avoid all exposure to hazards such as machinery and heights.  Tr. 130.

### 2.    Mental impairments

#### a.    Treatment history

Following Rollins's April 2012 visit to the emergency room for back pain and reported

suicidal thoughts, on April 11, 2012,[5] Rollins underwent an Adult Diagnostic Assessment at

Turning Point.  Tr. 430, 431, 434, 435, 446-454 (Exhibit 13F).  The assessor[6] noted the

following mental status examination findings: well groomed, average eye contact, clear speech,

---

[5] There is one page included in Exhibit 13F that is dated April 11, 2013.  *See* Tr. 452.  However, all other dated
documents are dated April 11, 2012.  *See* Tr. 447, 453, 454.

[6] The name of the individual who conducted the assessment is not clear.

no delusions, suicidal thought and plan, hallucinations (auditory, visual, olfactory), logical thought process, moderate depressed mood, full affect, cooperative behavior, memory and attention/concentration impaired, average intelligence, poor judgment, and fair insight.  Tr. 453. The assessor diagnosed major depressive disorder, severe with psychotic features and cocaine dependence, full remission.  Tr. 454.  A GAF score of 45 was assigned.[7]  Tr. 454.

During an October 1, 2012, mental health visit, Rollins reported seeing things and hearing voices.[8]  Tr. 540.  She felt edgy and jumpy and had decreased energy to go out.  Tr. 540. She reported chronic knee pain, multiple losses and violent deaths of family members.  Tr. 540. Rollins's goal was to sleep better.  Tr. 540.  Rollins's prescription for Cymbalta was increased to address her poor sleep and mood.  Tr. 541.

On January 9, 2013, Rollins saw Melinda Smith, a nurse ("Nurse Smith").  Tr. 538-539. Rollins indicated that her medication was working well.  Tr. 538.  She denied medication side effects.  Tr. 538.  Rollins's mother had been sick and passed away a month prior.  Tr. 538.  With respect to Rollins's mental status, Nurse Smith observed that Rollins's appearance/demeanor/activity/speech were appropriate; thought process was logical; thought content was normal; there were no delusions and audio and visual hallucinations had decreased with medication changes; mood/affect were bright/full; there were no suicidal/homicidal ideation; behavior was cooperative; and insight/judgment were fair.  Tr. 538.

During an April 24, 2013, visit with Nurse Smith, Rollins reported the occurrence of three deaths in her family in a relatively short time (her mom and two sons-in-law).  Tr. 536.

---

[7] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

[8] The name of the medical provider is not clear.

Rollins indicated she had been having panic/anxiety episodes.  Tr. 536.  Nevertheless, mental status findings were relatively normal.  Tr. 536.  Nurse Smith added a medication for anxiety. Tr. 537.

On June 5, 2013, Rollins saw Nurse Smith and indicated that she was still feeling a little down.  Tr. 534.  She had missed a counseling session the day before.  Tr. 534.  Rollins denied any side effects and indicated she had been sleeping well.  Tr. 534.  Nurse Smith recorded relatively normal mental status findings.  Tr. 534.  For example, Nurse Smith indicated that Rollins's thought process was logical, her thought content was normal, her mood/affect was euthymic/full, and her insight/judgment was fair.  Tr. 534.  As discussed more fully below, on the same day, Nurse Smith completed a psychological medical source statement suggesting Rollins had very limited mental abilities.  Tr. 502-503.

### b.  Medical opinions

#### *Treating Nurse Melinda M. Smith, ACNS-BC, MSN, APN*

On June 5, 2013, Melinda M. Smith, a nurse with Turning Point Counseling Services, completed a Medical Source Statement: Patient's Mental Capacity check-box style form.  Tr. 502-503.  Nurse Smith rated Rollins's ability to perform basic mental work activities on a sustained basis.  Tr. 502.  The available ratings were: (1) "constant" meaning "ability to perform activity is unlimited;" (2) "frequent" meaning "ability for activity exists for up to 2/3 of a work day;" (3) "occasional" meaning "ability for activity exists for up to 1/3 of work day;" and (4) "rare" meaning "activity cannot be performed for any appreciable time."  Tr. 502.

Nurse Smith rated Rollins's ability as rare in the following 17 categories: (1) use of judgment; (2) maintain attention and concentration for extended periods of 2 hour segments; (3) respond appropriately to changes in routine settings; (4) maintain regular attendance and be

punctual within customary tolerances; (5) deal with the public; (6) relate to co-workers; (7) interact with supervisors; (8) function independently without redirection; (9) work in coordination with or proximity to others without being distracted; (10) working in coordination with or proximity to others without being distracting; (11) deal with work stress; (12) complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (13) understand, remember and carry out complex job instructions; (14) understand, remember and carry out detailed, but not complex job instructions; (15) behave in an emotionally stable manner; (16) relate predictably in social situations; and (17) management of funds/schedules. Tr. 502-503.

Nurse Smith rated Rollins's ability as occasional in the following 4 categories: (1) follow work rules; (2) understand, remember and carry out simple job instructions; (3) socialize; and (4) ability to leave home on own.  Tr. 502-503.  In 1 category – maintain appearance – Nurse Smith rated Rollins's ability as frequent.  Tr. 503.

Although prompted to do so, Nurse Smith did not identify a diagnosis or symptoms to support her assessment.  Tr. 503.  Also, she did not indicate how long Rollins had been a patient. Tr. 503.

### _Consultative Psychologist John J. Brescia, M.A._

Upon referral of the Ohio Division of Disability Determination, on August 10, 2012, psychologist John J. Brescia, M.A., met with Rollins and conducted a consultative psychological evaluation.  Tr. 467-478.  As part of his evaluation, Mr. Brescia reviewed materials sent by the Ohio Division of Disability Determination, including Disability Report – Appeal – Form SSA-3441, and Adult Diagnostic Assessment from the Turning Point Counseling Center in

16

Youngstown.  Tr. 467.  When asked to explain her disability, Rollins indicated that she had

suffered from bipolar disorder, depression and anxiety since she was 24 years old.  Tr. 467-468.

Rollins indicated that she had been hospitalized once when she was younger for

approximately three months after she tried to take her life.  Tr. 470.  Rollins also indicated that

she was treated three times in a crisis unit, with the last time being in the 1990's.  Tr. 471.

Rollins had also been receiving treatment since early 2011 at Turning Point.  Tr. 471.

Rollins reported that she spent most of her time at home.  Tr. 471.  Her sister or boyfriend

might take her out to eat or for a ride.  Tr. 471.  Rollins indicated that she liked to go to church

once in a while with her daughter.  Tr. 471.  Rollins's daughter took care of chores at the home.

Tr. 471.  On a "good day," Rollins might "wash a dish."  Tr. 471.  Rollins did not belong to

groups or clubs and did not socialize often.  Tr. 471.  Rollins had one friend that visited on

occasion and another friend who would pick Rollins up and take Rollins to her house.  Tr. 472.

Mr. Brescia diagnoses included depressive disorder NOS, nicotine dependence, and

personality disorder NOS and he assessed a GAF score of 50.  Tr. 476.  Mr. Brescia indicated

that he found that Rollins's account of her history and functioning was generally reliable.  Tr.

477.  In summary, Mr. Brescia stated:

> Results of this evaluation indicated that the claimant is exhibiting borderline
> cognitive functioning.  During the interview she described herself physically
> limited in what she could do because of her medical condition.  She outlined a
> number of complaints, including musculoskeletal problems affecting her back and
> knees.
>
> The claimant reported feelings of emotional distress, including depression.  She
> presented herself as rather angry, distrustful, and emotionally volatile at times.
> She had been involved in psychiatric treatment in the past, and was currently
> receiving outpatient services at a local agency and on psychotropic medication.

Tr. 477.

With regard to Rollins's prognosis, Mr. Brescia stated that Rollins "is currently involved in treatment, although problems persist. The treatment may help to stabilize her condition to some extent." Tr. 477. Mr. Brescia provided a functional assessment of Rollins's abilities in four areas, opining that:

1. *Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.*

The claimant is able to understand, remember, and carry out simple instructions, as well as some instructions involving multiple steps. She would have difficulty with more complex or detailed instructions.

2. *Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.*

The claimant has the ability to maintain attention and concentration to perform simple, repetitive tasks, and some familiar routine task[s] involving multiple steps. She is preoccupied with her condition and related problems, and often has difficulty in maintaining her focus on what she is trying to do. Pace of performance and persistence would appear to be quite limited.

3. *Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.*

The claimant would have of [sic] difficulty in interacting appropriately with supervisors and co-workers in a work setting. She presents herself as socially and emotionally isolated from people, and often preferring to be by herself. She has difficulty with trust issues and anger control at times.

4. *Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.*

The claimant would have difficulty in handling the pressures and demands present in a work setting. Her history and interview remakes [sic] indicate that she has not dealt with situational stressors appropriately or adaptively.

Tr. 477-478.

*State agency reviewing psychologist*

On August 17, 2012, Dr. Vicki Warren, Ph.D., completed a psychiatric review technique and a mental RFC assessment.  Tr. 131.  She opined that Rollins had moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  Tr. 127.  She found no evidence of decompensation.  Tr. 127.  For her mental RFC assessment, Dr. Warren opined that Rollins was limited to simple, routine, 1-2 step work procedures with no exposure to crowds or more than limited and superficial interaction with supervisors, coworkers, or the general public.[9]  Tr. 131.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

Rollins was represented by counsel and testified at the August 6, 2013, and October 30, 2013, hearings.  Tr. 53-67, 82-87.  Rollins discussed and described her past work.  Tr. 53-55, 84-87.  When asked why she alleged a disability onset date of March 29, 2011, Rollins indicated that is when the pain started getting worse in her knees and hands.  Tr. 82.

Rollins explained that a typical day includes waking in the morning, having some coffee, taking her medication with her breakfast, and if it is a good day maybe fold some clothes.  Tr. 55.  Otherwise, she usually watches television.  Tr. 55.  The extent of her pain and depression determines whether a day is or is not a good day.  Tr. 55.

---

[9] Dr. Warren indicated that her mental RFC was an adoption of a prior 2009 ALJ RFC.  Tr. 131.  The ALJ, however, did not adopt a prior 2009 ALJ decision because she concluded that there was new and material evidence relating to Rollins's physical impairments.  Tr. 32.  The ALJ did not make a specific finding that there was new and material evidence regarding Rollins's mental impairments but considered and weighed evidence relating to Rollins's mental impairments and assessed both Rollins's physical and mental RFC.  Tr. 34-36, 38-40.

Rollins takes Tramadol for her pain.  Tr. 57-58.  Her knee doctor prescribed the Tramadol.  Tr. 58.  Rollins indicated that the pain in her knees in unbearable.  Tr. 60.  Her pain is worsened by climbing stairs, standing, excessive walking, the weather (rain and snow), and even sitting.  Tr. 60.  Other than taking her pain medication, Rollins tries to relieve the pain through use of ice packs and warm compresses.  Tr. 60-61.  She tried injections in her knees but they did not really help.  Tr. 61.  She recently started seeing a new doctor for her knee.  Tr. 58.  He had ordered an MRI on her right knee and x-ray on her left but, as of the October 2013 hearing, Rollins had not yet had the test performed.[10]  Tr. 59.  Rollins was waiting on a call back to have the tests scheduled.  Tr. 59.  She was referred to pain management but, as of the October 2013, hearing, she was having trouble scheduling the appointment.   Tr. 58-59, 65.  The first doctor that she was referred to would not accept Rollins as a patient and attempts were being made to find another doctor that would treat her.  Tr. 65.  Rollins was not certain but the problem with finding a pain management doctor to treat her may have related to the type of insurance that she had.  Tr. 65.

Rollins has also had pain in her lower back.  Tr. 61.  Standing, excessive walking, and rainy and cold weather worsen her back pain.  Tr. 61.  Other than medication, Rollins uses ice packs and warm compresses at least four times each week to try to reduce her pain.  Tr. 61-62.

Rollins has pain in her neck three or four times each week.  Tr. 62.  Stress and depression seem to make Rollins's neck pain worse.  Tr. 62.

Rollins also has pain in her arms and hands.  Tr. 62.  In April 2013, Rollins saw her doctor complaining of a tingling sensation in her right arm and wrist, which had been occurring

---

[10] Because the tests had not yet been performed, the ALJ agreed to leave the matter open until November 19, 2013, for submission of the test results and/or to request an extension if Plaintiff wanted.  Tr. 59-60.  The ALJ indicated that if she did not have either the records or a request for extension by November 19, 2013, she would assume there was nothing to submit and would proceed to issue a decision based on what records the ALJ had.  Tr. 60, 75.

for two or three weeks.  Tr. 56.  Her doctor prescribed splints and medications for carpal tunnel

syndrome.  Tr. 56.  Up until that time, Rollins had not taken medication or used splints for her

carpal tunnel syndrome.  Tr. 56.  Rollins did not think that the splints or medication helped

much.  Tr. 56.  She reported wearing the splints at night and sometimes during the day but she

still feels tingling and pain in her hand along with redness and swelling.  Tr. 56.  Rollins has

difficulty using her hands during the day.  Tr. 57.  For example, it is hard for her to hold her

coffee cup because her hands are swollen and hurt and her daughter does her hair or buys her

wigs.  Tr. 57.  Also, Rollins sometimes has a hard time with buttons and, in order to pick up

coins, Rollins has to slide them off the table.  Tr. 57.

Rollins estimated being able to stand for about 10-15 minutes before needing to sit down

or change positions; she can walk about 15 minutes before she needs to stop and take a break;

and she can sit for about half an hour to an hour before she needs to change her position.  Tr. 64.

Rollins estimated being able to lift maybe 5-10 pounds.  Tr. 64.

Rollins feels her depression is due in part to her inability to do things that she used to do

such as going bowling and playing volleyball.  Tr. 62-63.  Also, her mom passed away.  Tr. 66.

Rollins has a best friend that visits with her and talks with her a lot.  Tr. 63.  That same friend

took Rollins to a cookout for the Fourth of July.  Tr. 63.  However, Rollins just sat there feeling

depressed while everyone else was dancing and playing.  Tr. 63.   Rollins's best friend had taken

her shopping about three weeks before the hearing but she usually does not shop very often

because she can only handle about 10 or 15 minutes in a store.  Tr. 66.  Rollins's daughter

handles the grocery shopping for Rollins.  Tr. 66.  Rollins has a difficult time falling asleep and

staying asleep.  Tr. 63.  Because of her sleep apnea, Rollins is trying to get a machine to help her

sleep.  Tr. 63-64.

2. **Vocational Expert's testimony**

 Vocational Expert ("VE") Mark Anderson provided a 15-year work summary (Tr. 282) and testified at the October 30, 2013, hearing (Tr. 68-75).[11]  The VE indicated that Rollins's past work included work as a housekeeper, an unskilled, light level job that was performed by Rollins at the light level and, as a residential aide, a semi-skilled, medium level job that was performed by Rollins at the light level.  Tr.  68-69, 282.

The ALJ asked the VE to assume a hypothetical individual of the same age, education, and work background as Rollins who was limited as follows:  could occasionally lift and/or carry, including upward  pulling, 20 pounds; frequently lift and/or carry, including upward pulling, 10 pounds; could stand and/or or walk with normal breaks for a total of 4 hours in an 8-hour workday and sit with normal breaks for about 6 hours in an 8-hour workday; pushing and pulling would be limited on the right lower extremities to occasional; could occasionally climb ramps and stairs and crouch; could never climb ladders, ropes and scaffolds; could never kneel or crawl; able to frequently balance and frequently stoop; bilateral fingering and handling limited to frequent; should avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, etc.; could not operate dangerous machinery; could have no exposure to unprotected heights; and no commercial driving; no visual or communicative limitations; limited to unskilled work which involves simple, routine and repetitive tasks with only simple decision making; not able to perform at a production rate pace such as assembly line work but can perform goal oriented work such as office cleaning; there should be infrequent changes and would be limited to infrequent, superficial interaction with coworkers or the general public.  Tr. 69-70.  The VE indicated that the described individual would not be able to perform Rollins's past work because Rollins's past work would require standing and walking beyond the stated 4 hours in an 8-hour period.   Tr. 70.

---

[11] No vocational expert testimony was provided at the August 6, 2013, hearing.  Tr. 90.

However, the VE indicated that there would be other work that the described individual could perform while sitting or standing, which would accommodate the limitation of standing and/or walking for 4 hours in an 8-hour workday, including (1) inspector and hand packager, a light, unskilled position; (2) assembler of electrical accessories, a light, unskilled position; and (3) and electronics worker, a light, unskilled position.[12]  Tr.  71.

For her second hypothetical, the ALJ asked the VE whether there would be work available if the first hypothetical was the same except the limitation of unskilled, simple, routine work was changed to simple, routine, one to two-step work procedures with no exposure to crowds or more than limited and superficial interaction with supervisors, coworkers or the general public.  Tr. 72.  The VE indicated that the change to one or two-step work procedures would alter his earlier answer but there would be other jobs available, including (1) gluer, a light, unskilled position; (2) assembler of communications equipment, a light, unskilled position; and (3) packager/assembler, a light, unskilled position.[13]  Tr. 72.  The VE indicated that the three jobs identified had a reasoning level one which accounted for the limitation of one or two-step work procedures.  Tr. 72.

For her third hypothetical, the ALJ asked the VE whether there would be jobs available for an individual who, due to the associated medical symptoms of the individual's medical condition and associated pain and mental impairments, would be unable to engage in sustained work activity for a full 8-hour workday on a regular and consistent basis.  Tr. 73.  The VE indicated that there would be no work available for an individual with said limitation.  Tr. 73. Also, the VE indicated that there would be no work available for an individual unable to sit,

---

[12] The VE provided national, state and regional job incidence data for each of the positions identified.  Tr. 71.

[13] The VE provided national, state and regional job incidence data for each of the positions identified.  Tr. 72.

stand and walk for a full 8-hour workday.  Tr. 73.  As far as being off-task, the VE indicated that generally an individual could be off-task for up to 9 minutes, or 15% of the time.  Tr. 73-74.  Beyond that, an individual would not be able to maintain a competitive work pace and therefore there would be no work available for that individual.  Tr. 74.

In response to questioning from Rollins's counsel, the VE indicated that changing the bilateral fingering and handling limitation from frequent to occasional would eliminate all jobs when combined with the limitation of giving and receiving simple instructions and infrequent contact with coworkers and the public  Tr. 74.  The VE indicated that, for unskilled work, employers will generally tolerate two absences, tardies or leaving early per month.  Tr. 75.  Thus, if an individual would miss three or more days a month, the individual would not be competitively employable based on attendance.  Tr. 74-75.

**D.**         **Evidence for which Rollins seeks a sentence six remand[14]**

May 9, 2014, hospital records reflect that, on November 14, 2013, Dr. Jones ordered Rollins a single point cane.  Tr. 6-9.  On April 10, 2014, Rollins saw Dr. Jones for the purpose of scheduling arthroscopic surgery.  Tr. 11.  Rollins had previously cancelled her surgery but her knees were getting worse.  Tr. 11.  On examination, Dr. Jones indicated that Rollins had significant crepitation of the patellofemoral joint bilaterally; medial joint line tenderness, and mildly positive McMurray's test.  Tr. 11.  Following discussions with Dr. Jones, Rollins decided she wanted to proceed with viscosupplementation injections on her left knee and arthroscopy surgery on her right knee.  Tr. 11.  On May 14, 2014, Dr. Jones performed a right knee

---

[14] As discussed more fully below, Rollins seeks a sentence six remand for consideration of evidence submitted post-hearing.  As noted above, the ALJ agreed to leave the record open until November 19, 2013, to allow Plaintiff time to submit test results that had been ordered but not performed and/or to request an extension if Plaintiff wanted.  Tr. 59-60, 75.  Test results from a November 7, 2013, MRI and November 14, 2013, visit with Dr. Jones were submitted prior to the decision being rendered.  Tr. 585-587.  The records described below were submitted later and it does not appear that a request for additional time was made.

arthroscopy with a partial medial meniscectomy, chondroplasty medical femoral condyle and chondroplasty of the patellofemoral joint.  Tr. 10, 12-20.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[15] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[16] claimant is presumed disabled without further inquiry.

---

[15] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[16] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her January 24, 2014, decision, the ALJ made the following findings:[17]

1.  Rollins had not engaged in substantial gainful activity since March 29, 2011, the application date.  Tr. 34.

2.  Rollins had the following severe impairments: degenerative disc disease of the cervical spine; degenerative disc disease/degenerative joint disease of the lumbosacral spine; osteoarthritic changes of the lower cervical spine; degenerative joint disease involving the knees; status post surgery right knee; morbid obesity; mild osteoarthritis right hip; obstructive sleep apnea/restless leg syndrome; carpal tunnel syndrome; chronic obstructive pulmonary disease; major depressive disorder severe with psychotic features; personality disorder; and panic disorder with agoraphobia.  The following impairments were non-severe:  low-grade pancreatitis; dysfunctional uterine bleeding; left paratubal cyst measuring 3x6 centimeters that responded well to surgery; cocaine dependence in full remission; gastroesophageal reflux disease and diabetes mellitus.  Tr. 34-35.

---

[17] The ALJ's findings are summarized.

3.      Rollins did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 35-36.

4.      Rollins had the RFC to perform a range of work at the light exertional level with the following limitations: could occasionally lift and/or carry (including upward pulling) 20 pounds and could frequently lift and/or carry (including upward pulling) 10 pounds; could stand and/or walk (with normal breaks) for a total of 4 hours in an 8-hour workday; could sit (with normal breaks) for about 6 hours in an 8-hour workday; pushing and/or pulling (including operation of foot controls) limited to occasional in the right lower extremity; could occasionally climb ramps or stairs and crouch; could never climb ladders, ropes, or scaffolds, kneel or crawl; could frequently balance, stoop and perform bilateral fingering and handling; must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation; limited to no operation of commercial equipment, dangerous machinery, and must avoid unprotected heights; there are no visual or communicative limitations; limited to simple, routine, 1-2 step work procedures with no exposure to crowds or more than limited and superficial interaction with supervisors, coworkers and the general public. Tr. 36-40.

5.      Rollins was unable to perform any past relevant work.  Tr. 40-41.

6.      Rollins was born in 1965, and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 41.

7.      Rollins has a limited education and is able to communicate in English. Tr. 41.

8.      Transferability of job skills was not material to the determination of disability.  Tr. 41.

9.      Considering Rollins's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Rollins could perform, including gluer, assembler of communications equipment, and packager/assembler.  Tr. 41-42.

Based on the foregoing, the ALJ determined that Rollins had not been under a disability since March 29, 2011, the date the application was filed. Tr. 42.

**V. Parties' Arguments**

Rollins argues that the ALJ failed to assign appropriate weight to the psychological medical opinions provided by Nurse Smith, a treating medical provider, and Mr. Brescia, a psychological consultative examiner (Doc. 16, pp. 13-16) and failed to assign appropriate weight to the physical medical opinion provided by Dr. Lakhani, a consultative examining physician (Doc. 16, pp. 16-18).   Rollins also requests a sentence six remand arguing that there is new and material evidence and that Rollins had good cause for not incorporating the additional evidence into the record during the administrative proceedings.  Doc. 16, pp. 18-22.

In response, the Commissioner argues that the ALJ reasonably evaluated the opinion evidence (Doc. 19, pp. 13-20) and that a sentence six remand is not warranted because the evidence Rollins seeks to have considered is neither new nor material (Doc. 19, pp. 23).

**VI. Law & Analysis**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

28

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.     The ALJ properly evaluated the opinion evidence

Rollins challenges the ALJ's assignment of weight to the opinions of Dr. Lakhani, Mr. Brescia, and Nurse Smith, arguing that the ALJ erred by assigning more weight to the opinions of non-examining medical sources.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 416.945(a); 20 C.F.R. § 416.946(c).  It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  In assessing a claimant's RFC, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 416.927 and to explain the weight assigned.  *See* 20 C.F.R. § 416.927(e)(2).  However, the ALJ is not obliged to include in her decision an exhaustive factor-by-factor analysis of the factors.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Consistent with the Regulations, the ALJ assessed Rollins's RFC.  Among other limitations in Rollins's RFC, the ALJ limited Rollins to a reduced range of light work, including

a limitation of walking and/or standing for 4 hours in an 8-hour workday and a limitation of frequent bilateral fingering and handling.  Tr. 36.  Also, the ALJ included limitations to account for Rollins's mental impairments.  Tr. 36.  In assessing Rollins's RFC, the ALJ fully considered evidence of Rollins's physical and mental impairments (Tr. 35, 36-40) and Rollins has not shown that the RFC is not supported by substantial evidence.  For example, physical limitations included in the RFC are supported by opinion evidence from state agency reviewing physicians. Tr. 40, 116-134.  Additionally, the mental RFC limitation restricting Rollins to simple, routine, 1-2 step work procedures is supported by Mr. Brescia's opinion that "[t]he claimant has the ability to maintain the attention and concentration to perform simple, repetitive tasks, and some familiar routine task[s] involving multiple steps."  Tr. 40, 477.   The mental RFC limitations are also supported by the opinion of Dr. Warren, a state agency reviewing psychologist, who considered, among other evidence, Mr. Brescia's evaluation and records from Turning Point.  Tr. 39, 126-128, 131.

As one-time consultative examiners, Dr. Lakhani and Mr. Brescia did not have an ongoing treatment relationship with Rollins and therefore their opinions were not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).   Additionally, the ALJ correctly concluded that Nurse Smith was not an acceptable medical source (Tr. 40). *Compare* 20 C.F.R. § 416.913(a) ("Acceptable medical sources" are-- (1) Licensed physicians (medical or osteopathic doctors); (2) Licensed or certified psychologists; (3) Licensed optometrists; (4) Licensed podiatrists; and (5) Qualified speech-language pathologists) *with* 20 C.F.R. § 416.913(d) ("Other sources" include medical sources not listed in 20 C.F.R. § 416.913(a) such as nurse practitioners, physicians' assistances,

chiropractors, and therapists).   Therefore, even though Nurse Smith treated Rollins, she is not a treating source entitled to controlling weight under the Regulations.  *See Considering Opinions and Other Evidence from Sources who are not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by other Governmental and Nongovernmental Agencies* - SSR 06-3p, 2006 WL 2329939, * 2 (August 9, 2006); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-531 (6th Cir. 1997) (treating chiropractor as an "other source," not an "acceptable medical source" within meaning of regulation, thus ALJ has discretion to determine appropriate weight to accord chiropractor's opinion based on all evidence in record).

Although the opinions of Dr. Lakhani, Mr. Brescia, and Nurse Smith were not entitled to controlling weight under the treating physician rule, consistent with the Regulations, the ALJ considered all three opinions along with other evidence in the record and explained the weight assigned.  In particular, the ALJ gave some weight to Dr. Lakhani's opinion but found that a reduced range of light work, rather than less than sedentary work, was more consistent with Rollins's "mild objective findings, full strength and no need for ambulatory aids."  Tr. 39-40.  With respect to Mr. Brescia's opinion, the ALJ gave it some weight as well but found that the "record as a whole [did] not support more than moderate limitations."  Tr. 40.  Also, in weighing Mr. Brescia's opinion, the ALJ questioned the veracity of Rollins's reports to Mr. Brescia because Rollins was working as a babysitter at the time of Mr. Brescia's assessment of Rollins (Tr. 86-87) but Rollins had not shared this information with Mr. Brescia (Tr. 470).  Tr. 40.  Thus, the ALJ concluded that Mr. Brescia's assessment was limited in credibility and persuasiveness.  Tr. 40.  The ALJ gave little weight to Nurse Smith's assessment because she was not an acceptable medical source, had treated Rollins for less than a year, her treatment notes were

sparse and her treatment notes that did exist did not support the extreme limitations she suggested.  Tr. 40.

Rollins has not shown error with respect to the ALJ's analysis of the medical opinion evidence nor has she demonstrated that the RFC assessment is not supported by substantial evidence.  Moreover, in reviewing the Commissioner's decision, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted).  "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted).   Also, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004).  Thus, to the extent that Rollins attempts to have this Court consider evidence de novo or reweigh the evidence, her efforts are misguided.

For the reasons set forth herein, the Court finds no error with respect to the ALJ's consideration of and weighing of the medical opinion evidence or with respect to the ALJ's RFC assessment.

**B.      Rollins's request for a sentence six remand is not warranted**

Rollins has requested a sentence six remand for the purpose of considering evidence not presented to or considered by the ALJ.  In particular, she requests consideration of May 9, 2014, hospital records that reflect that, on November 14, 2013, Dr. Jones ordered Rollins a single point cane.  Tr. 6-9.  Also, she seeks consideration of evidence from April 10, 2014, showing

continued problems with her knees and evidence that Rollins proceeded with arthroscopic surgery on May 9, 2014.  Tr. 10-20.

The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ.  *See Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner,* 96 F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir. 1993); see also *Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ.").  The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner,* 447 F.3d 477, 486 (6th Cir. 2006).  The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it only can consider such evidence in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon,* 499 F.3d 506, 513 (6th Cir. 2007); *Foster,* 279 F.3d at 357.

The plaintiff has the burden under sentence six of 42 U.S.C. §405(g) to demonstrate that the evidence she now presents in support of a remand is "new" and "material," and that there was "good cause" for her failure to present this evidence in the prior proceedings.  *See Hollon,* 447 F.3d at 483; *see also Ferguson v. Commissioner,* 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden

of showing "good cause" for failure to submit materials and that the evidence was "material."). Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied).  "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (internal quotations and citations omitted and emphasis supplied).  "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (internal quotations and citations omitted and emphasis supplied).

Even if Rollins could satisfy the "good cause" element, she has failed to carry her burden of demonstrating that the new evidence is "new" or "material."  In arguing that the records are "material," Rollins contends that the records show that Rollins had "more extensive treatment than what was in the record including another surgery which was alluded to as necessary in the medical records that were in front of the ALJ."  Doc. 16, p. 20.  She further states that "[e]ven though the surgery occurred after the hearing, it was based upon an MRI which was in the file at the time of the hearing.  The surgery demonstrates that the severe impairment was worse than what was known at the time of the hearing." Doc. 16, p. 20.  The foregoing argument and the record before the ALJ demonstrate that the ALJ was fully aware of the recommendation for an MRI and arthroscopic surgery as well as Rollins's desire to proceed with surgery.  Tr. 37 (citing Exhibit 27F (Tr. 585-586), November 7, 2013, MRI results and November 14, 2013, records reflecting Rollins' intent to proceed with arthroscopic surgery); Tr. 59-60.

Rollins has not shown that there is a reasonable probability that a different decision would have been reached had the surgery been performed prior to the ALJ's decision.  As

indicated, the ALJ was well aware of the recommendation of surgery as an option as well as Rollins's preference for surgery.  Tr. 37.  Thus, she cannot satisfy the "material" element. Further, Rollins has not shown that the evidence is "new."   For example, the evidence does not document a new condition.  Rather, the evidence documents the completion of surgery that the ALJ was aware was recommended and contemplated prior to her decision.

At best, the allegedly "new" and "material" evidence is evidence of a worsening condition.  However, a sentence six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio Jan. 18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)).  If Rollins's condition seriously worsened after the administrative hearing, an appropriate remedy would be the initiation of a new claim for benefits as of the date that her condition rose to the level of a disabling impairment.  *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

Based on the foregoing, Rollins is not entitled to a sentence six remand for the purpose of considering additional evidence not submitted to the ALJ.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

May 16, 2016

_____
Kathleen B. Burke
United States Magistrate Judge